Timothy Allan BUNESS, Appellant,

v.

Seanne GILLEN and Gerry Wayne Smith, Appellees.

No. S–2802.

Supreme Court of Alaska.

Oct. 27, 1989.

Peter M. Page, Juneau, for appellant.

W. Clark Stump, Stump & Stump, Ketchikan, for appellee Seanne Gillen.

Before MATTHEWS, C.J., and RABINOWITZ, BURKE, COMPTON and MOORE, JJ.

## OPINION

RABINOWITZ, Justice.

## I. FACTS AND PROCEEDINGS.

This is a dispute over the custody of Corey Tucker Gillen ("Tucker"), born January 2, 1977. Tucker's mother is Seanne Gillen, a resident of Ketchikan. When Tucker was born and for approximately 8–10 months thereafter (until the fall of 1977), Seanne was living with Gerry Wayne Smith ("Gerry"); they were never married. Gerry admits that he is Tucker's father, although he is not listed as Tucker's father on the birth certificate (the space provided is blank) and his paternity has not been formally acknowledged or adjudicated.[1] Nor has he ever paid, or been asked to pay, any child support. Tucker's paternity is not at issue, however, and Gerry does not now seek, nor has he ever sought, custody of Tucker.

In the spring or summer of 1978, Seanne and Timothy Allan Buness ("Tim"), both living in Wrangell, began dating; they never married. In September 1979, Seanne and Tucker moved into Tim's home. On August 16, 1980, Seanne gave birth to Sabra Jade Buness ("Sabra"). Notwithstanding Sabra's surname, no father is listed on the birth certificate, nor has her paternity been legally established. However, Tim and Seanne both admit that Tim is Sabra's biological father. Although Sabra and Tucker have grown up as brother and sister, and although both Seanne and Tim believe that they should not be separated, custody of Sabra is not at issue on appeal. The issues on appeal pertain exclusively to custody of Tucker, which both Seanne and Tim seek.

Tim and Seanne's versions of subsequent facts differ somewhat. Because Seanne prevailed on summary judgment, we will present Tim's version of the facts.[2]

From December 1981 to September 1982, Tucker and Sabra spent approximately three days a week with Seanne and four days a week with Tim. From September 1982 to 1985, Tucker and Sabra spent five days a week with Tim and two days a week (Saturday morning to Monday morning) with Seanne. From September 1982 to January 1984, Tim voluntarily paid Seanne $200 per month in child support for the care of both Tucker and Sabra; payments were stopped "[b]ecause the children were residing in my home most all of the time." Tim estimates that he has provided "probably 99 percent" of the financial support for both children.

Beginning sometime in 1985, Tucker no longer regularly spent weekends with Seanne. In May 1986, Seanne moved from Wrangell to Ketchikan. From June 1986 until this custody proceeding was commenced in August 1987, Sabra and Tucker lived continuously with Tim, except for two weeks in the summer of 1986, parts of school vacations, and six weeks in the summer of 1987, when they were with Seanne. Seanne's insistence that Sabra live with her in Ketchikan during the 1987–88 school year apparently prompted Tim to file suit for custody of both Sabra and Tucker on August 19, 1987. At this time they were both with Tim in Wrangell.

Tim's complaint also sought an order enjoining Seanne from removing Tucker and Sabra from Wrangell and the Wrangell school system during the 1987–88 school year, "except in accordance with visitation rights." Seanne counterclaimed for custody of both children. After a hearing, the superior court granted Tim's request for

---

1. *See* AS 25.20.050.

2. His version is not patently unreasonable, and the superior court was "required to draw all reasonable inferences in favor of the non-moving party and against the movant." *Clabaugh v. Bottcher,* 545 P.2d 172, 175 n. 5 (Alaska 1976).

injunctive relief. Gerry was subsequently joined as a defendant. Gerry opposed Tim's request for custody.

In February 1988, Seanne moved for partial summary judgment as to custody of Tucker. Tim opposed the motion. Without hearing oral argument, the superior court granted Seanne's motion, stating in its order that "Timothy Allan Buness is not a real party in interest, has no legal claim to custody of Tucker, and ... defendants are entitled to custody of Tucker as a matter of law." The superior court's accompanying memorandum did not address the standing issue, which was fully briefed by the parties. Rather, the court concluded that no material question of fact existed. In particular, Tim had not made any "specific allegations of clear detriment" that would result if Seanne were awarded custody.

Tim moved for reconsideration on four grounds:

[1] [T]he Court mistakenly believed that Corrine Radergraham was acting as a guardian ad litem ... instead of a paid expert witness;

[2] the Court was mistaken in determining that plaintiff, the non-moving party, was required to prove his case by affidavit in order to prevail against defendant's Motion for Summary Judgment;

[3] the Court overlooked or misapplied AS 25.30.030 et seq. in concluding that Tim Buness had no standing to bring this action[;] and

[4] the Court misapplied the standard applicable to parent vs. non-parent custody disputes.

Tim's motion for reconsideration was summarily denied. Tim brought this appeal.[3]

## II. DID THE SUPERIOR COURT ERR IN GRANTING SUMMARY JUDGMENT TO SEANNE?

### A. *Standing.*

In order to protect the relationship between a stepfather and a stepchild, this court held in *Carter v. Brodrick*, 644 P.2d 850 (Alaska 1982) "that where a stepparent has assumed the status of in loco parentis, a stepchild is a 'child of the marriage' within AS 09.55.205 [renumbered 25.24.150]." *Id.* at 855. We further stated:

What can be distilled from the above provisions is that the legislature anticipated and granted the court jurisdiction to determine the custody and visitation of a child in a variety of situations where biological parentage is not a determinative factor of jurisdiction. The statutes recognize that those relationships that affect the child which are based upon psychological rather than biological parentage may be important enough to protect through custody and visitation, to ensure that the child's best interests are being served.

*Id.*

Standing is an issue here because Seanne and Tim were never married, thereby making AS 25.24.150(a) ("[i]n an action for divorce or for legal separation or for placement of a child when one or both parents have died") inapplicable.[4] Alaska's other statute concerning a custody dispute is AS 25.20.060, which states in full:

*Custody of the child.* (a) If there is a dispute over child custody, either parent may petition the superior court for resolution of the matter under AS 25.20.060–25.20.130. The court shall award custody on the basis of the best interests of the child. In determining the best interests of the child, the court shall consider all relevant factors including those factors enumerated in AS 25.24.150(c).

(b) Neither parent, regardless of the question of the child's legitimacy, is entitled to preference in the awarding of custody.

(c) The court may award shared custody to both parents if shared custody is

---

**3.** Tim has not argued the guardian ad litem issue on appeal.

**4.** Under these circumstances, the statute also gives authority to the court to grant visitation rights to grandparents and other persons. Thus, Tim could not obtain visitation rights pursuant to AS 25.24.150(a), Alaska's only visitation stat-

ute. However, other courts have held that visitation rights can arise under general equity principles as well as under statutory authority. *See, e.g., Klipstein v. Zalewski,* 230 N.J.Super. 567, 553 A.2d 1384, 1385 (N.J.Super.Ch.Div. 1988).

determined by the court to be in the best interests of the child. An award of shared custody shall assure that the child has frequent and continuing contact with each parent to the maximum extent possible.

Seanne essentially argues that this statute is the exclusive authority for requesting legal custody of a child outside of the circumstances enumerated in AS 25.24.-150(a) (that is, divorce, legal separation, death of parent or parents). She argues that Tim cannot invoke the court's jurisdiction because he is not Tucker's "parent," and AS 25.20.060 mentions only parents.

Tim argues that AS 25.20.060 is not the exclusive statute conferring standing to invoke the court's power to adjudicate child custody disputes,[5] and that even if it were, he should be considered a parent within the meaning of the statute because he is Tucker's "psychological parent."

We are persuaded that Tim's construction of AS 25.20.060 is correct. This statute was passed in 1977. Ch. 63, § 6, SLA 1977. Its manifest purpose is to set standards for the adjudication of custody disputes between parents in a non-divorce setting. It does not imply that that the superior court lacks jurisdiction to adjudicate custody disputes between a parent and a non-parent. Such disputes are civil matters over which the superior court has undoubted subject matter jurisdiction. AS 22.10.020(a). *See, e.g., Britt v. Britt,* 567 P.2d 308 (Alaska 1977); *Turner v. Pannick,* 540 P.2d 1051 (Alaska 1975). As we noted in *Carter v. Brodrick:*

> It is also clear that the court would have jurisdiction to award *custody* of a stepchild to the stepparent if the court found that custody with the natural parent would be clearly detrimental to the child.

644 P.2d at 855 (emphasis in original).

Because AS 25.20.060 does not purport to exclude jurisdiction in the superior court of custody disputes between parents and non-parents, it is not germane to the question of Tim's standing. With respect to that point, we hold, consistent with *Carter v. Brodrick,* that a non-parent who has a significant connection with the child has standing to assert a claim for custody. *See* 2 H. Clark, *The Law of Domestic Relations in the United States* § 20.6, at 526–27 (2d ed. 1987).[6] Tim unquestionably does have a significant connection with Tucker, and we hold that he has standing to assert a claim for custody.

### B. *Genuine Issue of Material Fact.*

In granting Seanne's motion for partial summary judgment the superior court relied on *Turner v. Pannick,* where we stated in part: "[P]arental custody ... [is] preferable and only to be refused where clearly detrimental to the child." 540 P.2d at 1055. In *Turner* we articulated addi-

---

**5.** Tim argues that AS 25.30.030 gives him standing to bring this action. This statute, which is a provision of the Uniform Child Custody Jurisdiction Act (UCCJA), AS 25.30.010–25.30.910, states:

> *Notice and opportunity to be heard.* Before making a decree under this chapter, reasonable notice and opportunity to be heard, taking into account education and language differences which are known or reasonably ascertainable, shall be given to the contestants, any parent whose parental rights have not been previously terminated, and any person who has physical custody of the child. If any of these persons is outside this state, notice and opportunity to be heard shall be given under AS 25.30.040.

In *Carter v. Brodrick,* we stated that the UCCJA "recognizes that the court has jurisdiction in custody disputes which may involve parties other than biological parents." 644 P.2d at 855.

**6.** *Accord* 2 J. Atkinson, *Modern Child Custody Practice* § 8.04, at 414 (1986) ("[A] mechanistic approach to standing does not focus on the best interests of the child, particularly in cases where the stepparent has a substantially closer relationship with the child than the natural parent. A better approach is to allow standing to stepparents...."); *id.* at 413 ("Most states, by statute or case law, allow a nonparent standing to assert a claim for custody, at least if the nonparent has a significant connection with the child."); *In re B.G.,* 523 P.2d 244, 253–54 (Cal. 1974) (holding that a "de facto parent" has standing to participate in a child custody action brought by the child's natural mother); *In re Marriage of Allen,* 28 Wash.App. 637, 626 P.2d 16, 21 (Wash.App.1981) (holding that a stepparent who has an *in loco parentis* relationship to a stepchild is a "parent" within the meaning of the statute providing that a parent can commence a child custody proceeding).

tional factors that the superior court should consider in resolving custody disputes between a biological parent and a non-biological parent: "[U]nless the superior court determines that a parent is unfit, has abandoned the child, or that the welfare of the child requires that a non-parent receive custody, the parent must be awarded custody."[7]  *Id.*

■ As noted above the superior court summarily denied Tim's motion for reconsideration of the court's grant of partial summary judgment in favor of Seanne. Review of the record leads us to conclude that the superior court abused its discretion in denying Tim's motion for reconsideration.  Given the materials Tim filed in support of his motion for reconsideration, we conclude that there exists a genuine issue of material fact as to whether the welfare of the child requires that Tim receive custody.  There is evidence in the record in the form of a report by a school psychologist as to a highly emotional response by Tucker upon learning that he was to be taken out of Tim's home.  This points to the strong emotional bond that may have developed between Tim and Tucker over the past ten years.  During this period Tim has been Tucker's primary care-giver and father figure.  Under these circumstances it is our view that the motion for reconsideration should have been reason enough to require a trial as to the question of detriment to Tucker.[8]  Consequently, it was error for the superior court to deny the motion for reconsideration thus resolving this dispute on summary judgment.

The superior court's grant of summary judgment and denial of Buness's motion for

reconsideration are REVERSED and the case is REMANDED for further proceedings not inconsistent with this opinion.

---

7. The burden of showing detriment to the child, by a preponderance of the evidence, is on the non-parent.  *Britt,* 567 P.2d at 310 (citing *Turner,* 540 P.2d at 1055).

8. We note that severing the bond between the psychological parent and the child may well be clearly detrimental to the child's welfare.  *See Doe v. Doe,* 92 Misc.2d 184, 399 N.Y.S.2d 977, 982 (N.Y.Sup.Ct.1977) ("Where such a psychological parent-child relationship has developed, disruption of this relationship can be even more traumatic and devastating on occasion than sev-

ering the tie with a natural parent.")  *See also* Justice Compton's dissenting opinion in *Matson v. Matson,* 31 Wash.App. 133, 639 P.2d 298, 302 (Alaska 1982):

> Here, stability itself may be the most salient consideration.  To remove Shannon from the only stable home environment she has known would sever her bond to her "psychological parent," and to her "siblings."  Such considerations are sufficient, in my view, to establish a showing of clear detriment.

(Citations omitted.)